GARRETT, J.
LDM appeals from the juvenile court’s order that she be allowed only supervised visitation with the child, LM. For the following reasons, we affirm the trial court judgment.
FACTS
The facts and issues in this case are intertwined with those in State in Int. of H.M. and Q.M., 49,097 (La.App.2d Cir.3/26/14), 134 So.3d 678. DM is the mother of eight children: SM, KM, BM, YM, RM, HM, QM and LM. DM’s oldest daughter, SM, is now 20 years old, but was in foster care in Virginia from the ages of 12 to 15. DM was convicted of fraud and embezzlement in Virginia. She claimed she was sentenced to serve five years and ordered to make restitution. According to DM, she picked up SM from foster care and was on the run with her family for years, moving from state to state.
In the present proceedings, DM mentioned that she “caught the charge” in Louisiana in 2009. The record is not clear, but it appears this involved a new criminal charge in Louisiana for which DM was initially given a suspended sentence, had her probation revoked, and was required to serve her sentence. According to DM, she began doing prison time in Louisiana in January 2012. She was placed in Caddo Correctional Center (“CCC”) and transferred to Louisiana Transitional Center for Women (“LTCW”) in Tallulah. She was eventually sent to Virginia to serve her sentence in that state.
LM’s father is FM, who lives in Shreveport. LM’s date of birth is June 15, 2011. After DM’s incarceration in Louisiana, LM went to live with her father.
|2The father of HM, QM, and RM is JG, who now lives in New Orleans. DM gave SM a power of attorney and provisional custody of HM, QM and RM, with instructions to take care of the younger siblings and stay in touch with her mother.[1] SM did not stay in touch with her mother and DM claimed that she became concerned about the children. While at CCC and LTCW, DM became friends with another inmate, TW, who was released in October 2012. DM gave TW provisional custody of HM, QM, and RM.
Tragically, on June 17, 2013, three-year-old RM was taken to Louisiana State University Health Sciences Center (“LSUHSC”) in Shreveport with severe injuries from which she died. TW allegedly beat the child with an extension cord, which caused the fatal injuries. The State of Louisiana, Department of Children and Family Services (“DCFS”) took QM and HM into custody at this point.
Due to the death of RM, authorities in Virginia granted DM an early release from incarceration and she returned to Shreveport to attend the funeral. DM and SM, who now had a two-week-old infant, checked into the Plantation Inn motel. KT, the father of SM’s child, stayed in the room with them.
FM determined that DM should spend some time with LM, who was then two years old. He took the child to the motel and stayed with the group for several days, but left occasionally to work. On June 30, 2013, the DCFS received a report that smoking and drinking were going on in the motel room and that LM was not adequately supervised. It was also reported that KT 1¡¡was a child molester.[2] By the *808 time the DCFS located DM, she had moved to a different motel with SM and SM’s baby. FM had returned to his fian-cée’s residence along with LM. The DCFS took custody of LM from her father.
On July 2, 2013, an instanter order and rule to show cause were issued by the juvenile court finding reasonable grounds to believe that LM was a child in need of care due to lack of supervision. LM was placed in the temporary custody of the DCFS, put in a foster home, and a continued custody hearing was scheduled for July 8, 2013.
At the continued custody hearing, DM and FM were drug tested and both tested positive for marijuana. FM stated that he last smoked marijuana on July 4. DM said that she last smoked marijuana on the day she got back to Shreveport after her release from prison in Virginia. DM denied that she smoked marijuana or drank in front of the children. DM had obtained employment and was making arrangements to rent a house so that three of her children from Virginia could come to live with her. DM stated that after she regained custody of her children, she wanted to return to Virginia where her family lives.
FM testified that he lived with his fian-cée, who had helped him care for LM since the child was six months old. He worked in the kitchen at LSUHSC until December 2012, when he lost his job. He currently performs lawn work, but hoped to soon begin regular employment working with |/‘tractor trucks.” FM promised that if LM was returned to his custody, he would stop smoking marijuana.
FM’s fiancée, LJ, testified that she had been in a relationship with FM off and on for more than seven years and helped care for LM. She was employed and claimed that she does not smoke, drink, or use drugs.
At the conclusion of the continued custody hearing, the court placed temporary custody of LM with her father and allowed DM supervised visitation with the child. The court expressed serious concerns that DM would take the child and flee to Virginia. The court stated, “I don’t want to have to send the FBI out after her.” The court emphasized to FM the importance of supervised visitation and told FM, “Sir, if she flees with the child, and I become convinced it’s because of your lack of supervision of the visitation, you’ll be in contempt of court, six months in jail.”
The child in need of care adjudication for LM was held on August 29, 2013. DM stipulated that LM was a child in need of care, but denied the allegations of lack of adequate supervision of the two-year-old child. The juvenile court accepted the stipulation.
The disposition hearing was held on September 26, 2013. For purposes of disposition, LM’s case was consolidated with the case involving HM and QM. No objection was lodged by any of the parties to the matters being heard at the same time. Because all of the children were in the custody of their respective fathers, the juvenile court found that permanent placement of the children had been achieved. The court rejected DM’s implicit argument that she was not responsible for what happened to RM when she placed the child with a stranger she met in prison. Due to her lack | Bof judgment, the court refused to trust her with the exclusive unsupervised care of the children. Finding that HM and QM continued to be children in need of care, the court allowed them to remain in their father’s custody in New Orleans *809 with only supervised visits with their mother.
As to LM, the court made a similar finding. The court found that placement of custody of LM with her father was the least restrictive disposition. Although FM was comfortable with DM having unsupervised visitation with LM, the DCFS requested supervised visits. The court continued its order for supervised visitation because it feared that DM was still a flight risk. The court also found that DM did not exercise the type of judgment the court would be satisfied with to trust the child to her unsupervised care. The judge reiterated to FM that he would be held in contempt of court if he failed to supervise DM’s visits. The juvenile court retained jurisdiction in these cases. Judgment in conformity with this ruling was signed on October 1, 2013.
DISPOSITION
DM appeals the disposition. While admitting that the adjudication of LM as a child in need of care followed a valid stipulation, she argues that the disposition allowing her only supervised visitation with LM is unduly harsh and relies heavily upon the adjudication of HM and QM. She contends that if the adjudication of HM and QM is reversed, the disposition in LM’s case should likewise be overturned. In that event, DM asserts, the disposition in the instant case would only rest upon DM’s “minimal marijuana use” and the disposition should be modified to joint custody with |6a protective order directing both parents to abstain from using illegal drugs. These arguments are without merit.
Legal Principles
DM stipulated that LM was a child in need of care in accordance with La. Ch. C. art. 647.[3] La. Ch. C. art. 681 provides in pertinent part:
A. In a case in which a child has been adjudicated to be in need of care, the child’s health and safety shall be the paramount concern, and the court may do any of the following:
(1) Place the child in the custody of a parent or such other suitable person on such terms and conditions as deemed in the best interest of the child including but not limited to the issuance of a protective order pursuant to Article 618.
According to La. Ch. C. art. 683, the court shall impose the least restrictive disposition of the alternatives enumerated in Article 681 which the court finds is consistent with the circumstances of the case, the health and safety of the child, and the best interest of society.
It is well settled that an appellate court cannot set aside a juvenile court’s findings of fact in the absence of manifest error or unless those findings are clearly wrong. In re A.J.F., 2000-0948 (La.6/30/00), 764 So.2d 47; State in Int. of L.M., W.M., O.M., M.M. and M.M., 46,078 (La.App.2d Cir.1/26/11), 57 So.3d 518; In *810 terest of C.C. v. E.C.C., 2001-1364 (La. App.3d Cir.3/20/02), 813 So.2d 576. In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inference of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the juvenile court. State in Int. of L.M., W.M., O.M., M.M. andM.M., supra.
The juvenile court’s determination concerning the placement of a child in need of care is entitled to great weight and will not be reversed on appeal absent an abuse of discretion. State in Int. of L.M., W.M., O.M., M.M. and M.M., supra; State in Int. of W.T., 35,289 (La.App.2d Cir.8/14/01), 795 So.2d 414, writ denied, 2001-2738 (La.10/26/01), 799 So.2d 1157. See also State in Int. of C.N. v. Hawkinberry, 42,085 (La.App.2d Cir.2/28/07), 953 So.2d 870.
Discussion
At the disposition hearing, FM stated that he did not object to DM having unsupervised visitation with LM. He had been supervising visitation and in his view the visits had gone well. DM was visiting LM three days a week. He believed that if he were not present, DM and LM could better develop a bond. FM did not have any concerns that DM would try to leave Louisiana with the child if she were granted unsupervised visitation. However, we note that in his testimony FM stated “I think the Judge made 18that clear when he told her he would send a marshal out.” He acknowledged that if she did flee, he would have to notify the DCFS and see what steps would need to be taken.
DM admitted at the disposition hearing that she wanted to return to Virginia, but said she would stay in Louisiana “until she got her children back.”
After listening to argument and questioning the parties, the juvenile court found that placing custody with FM was the least restrictive, most appropriate disposition. Despite FM’s lack of opposition to DM having unsupervised visitation with LM, the juvenile court ruled that DM’s visitation must continue to be supervised. The juvenile court noted DM’s lack of judgment and candor and stated its belief that DM was a flight risk. This belief was shared by the DCFS, which had argued in favor of supervised visitation. The court instructed FM to supervise visitation “in such a way that you will protect your child.” The juvenile court again warned FM that if it received a report that he had ignored the court’s order that visitation be supervised, he would be in contempt of court.
Based upon this record, the juvenile court was not manifestly erroneous or clearly wrong and did not abuse its discretion in ordering that DM’s visitation with LM be supervised. DM has a proven propensity to flee from justice. In the past, after being convicted of a crime in Virginia, DM fled, taking at least one of her children with her, without court authorization. She acknowledged that she and her family lived on the run for several years. DM expressed a desire to return to Virginia. Also, the court considered DM’s extremely poor judgment in entrusting three of her children to a 19virtual stranger who is now charged with cruelly abusing and killing one of the children. The juvenile court’s order of supervised visitation is completely justified and supported by the record. Further, as noted by the trial court, the order is always subject to review and modification in the future.
*811 CONCLUSION
For the reasons stated above, the juvenile court disposition ordering that DM have only supervised visitation with LM is affirmed. All costs in this court are assessed to DM.
AFFIRMED.

. At the time of these juvenile proceedings, DM stated that KM, BM and YM were in Virginia. The record contains no information regarding who is caring for these children.

. KT was contacted and denied being a child molester. He acknowledged that when he was 17 years old, he was involved with a 15- *808 year-old girl and was charged with indecent behavior with a juvenile.

. La. Ch. C. art. 647 provides:
With the approval of the petitioner and the department, if a child is in the custody of the department, a parent whose child is the subject of pending proceedings may, with or without admitting the allegations of the petition, stipulate that the child is in need of care according to Article 606, provided that:
(1) A prehearing conference has been convened in accordance with Article 646.1.
ti) The parent personally appears before the court.
(3) The court fully informs the parent of his rights as required by Article 625.
(4) The court fully informs the parent of the consequences of such a stipulation, including the parent’s responsibility to comply with the case plan and correct the conditions requiring the child to be in care.
(5) The parent knowingly and voluntarily consents to the judgment.